2012 Ark. App. 559

WAL–MART ASSOCIATES, INC., and Claims Management, Inc., Appellants

v.

Linda KEYS, Appellee.

No. CA 12–289.

Court of Appeals of Arkansas.

Oct. 10, 2012.

Bassett Law Firm, LLP, Fayetteville, by Curtis L. Nebben, for appellants.

Frederick S. "Rick" Spencer, for appellee.

LARRY D. VAUGHT, Chief Judge.

Appellant Wal–Mart Associates, Inc. (Wal–Mart) claims that the decision of the Arkansas Workers' Compensation Commission finding that Wal–Mart did not make a bona fide job offer to appellee Linda Keys following her admittedly compensable injury was not supported by substantial evidence. Wal–Mart also claims that the evidence does not support the Commission's determination that Keys suffered a twenty-five-percent wage-loss disability or that substantial evidence showed a change of physician was warranted. We see no error and affirm.

Keys, now age sixty one, testified that she had an eighth-grade education with a General Educational Development (GED). Keys testified that her previous employment history included approximately five years of work in a hospital cafeteria and sixteen years of work as a "stocker and puller" at Millbrook. Keys testified that she began working for Wal–Mart in 1996, where she operated cash registers and worked in various departments, including groceries, hardware, sporting goods, toys, and gardening. The parties stipulated that Keys sustained a compensable injury to her back on October 19, 2006. Relating to the injury, Keys testified that she felt a "pop" and sharp pain in her lower back while lifting a bicycle.

Keys testified that her first treating physician, Dr. James Blankenship, assigned the following restrictions: "No lifting greater than 20 lbs., no bending or stooping, no prolonged standing over 4 hrs, no prolonged sitting over 2 hrs." Wal–Mart initially allowed her to return to work as a door greeter for one shift. However, according to Keys's testimony, she was almost immediately returned to work duties that did not comply with her physical restrictions. The parties stipulated that Keys "reached maximum medical improvement and the end of her healing period on August 27, 2007."

For the primary issue on appeal, the parties argue whether Wal–Mart provided Keys with a bona fide job offer within her limitations. Evidence was presented at the hearing that immediately after being released to return to work in August 2007, she was offered (and accepted) a position as a Wal–Mart "greeter." However, she was required to conduct tasks that exceeded her physical limitations, such as stooping, standing for long periods of time, and stocking. On her final night working for Wal–Mart, she was stocking in health and beauty aids, but she left prior to finishing her shift (after only eighty minutes) because she was in "too much pain," which she characterized as a burning sensation in her shoulders and neck, accompanied by numbness in her legs and toes on her right foot.

According to Keys, in September 2007, her store manager, Larry Phillips, called her and stated that she could return to work at the door-greeter position. She refused based on her prior experience working in the greeter position. In reaching its decision that this September offer of employment did not constitute a bona fide offer precluding her from obtaining wage-loss disability, the Commission heavily relied on the following testimony offered by Keys:

Q. After Dr. Blankenship released you in August of 2007, how many different jobs did Wal–Mart offer you?

A. When I went back to work, they put me back to stocking.

Q. Okay. When did you go back to work?

A. It was, I think it was August, it was either the 25th or 28th. I'm not for sure.

Q. And who put you back to work as a stocker?

A. Larry Phillips. Well, Larry wasn't there, but that's what was said, that was to go to [department] 46. But John, I think it was John that—I don't remember his last name.

Q. Okay. When you were released by Dr. Blankenship, were you given any restrictions?

A. I wasn't released—I didn't know I was released until Yolanda called me and told me Dr. Blankenship released me.

Q. What was Larry Phillips'[s] title at Wal–Mart, at that time?

A. He was store supervisor. But I, I'm not sure if I, I'm trying to figure out which one I talked to first, whether it was Debbie or whether it was Larry or whether it was Ann. Because there was a lot of confusion of what I was supposed to be doing. And I'm, you know, I remember I talked to one of them, and they said that I would be a door greeter, and then, and I told them, I said, well, Larry had said department 46. And I said, but whichever, you know. And I said, which do you want me to do. And they said do whatever Larry tells you to do.

Q. So did you get, regardless of who made these comments after it was, door greeter or department 46, did you ever get with Larry to see exactly what he wanted you to do?

A. They put me in department 46 that night I went in.

Q. Okay. And what is department 46?

A. It's health and beauty aids, make-up, shampoo, eyeliner. I mean, it's, you have a variety—virtually, what it is is like cosmetic, health and beauty. It depends on which end of it they put you at.

Q. Okay. And what job were you doing in department 46?

A. The cart that they gave me to start on was, had shampoo in it, hair spray. It, well, now, it may have been shampoo. It may have been bubble bath. I'm not for sure.

Q. Were you given the job of stocking?

A. Yes, sir.

Q. Okay. Did doing that require you to lift more than 20 pounds?

A. No, but it required, you have to get down and put stuff on the lower shelves, the peg hooks. You, you have to, you know, there's, when you come to an item, there, you, you have to find where that item goes. And no matter where it goes, you have to put it there. And I was walking with a cane.

Q. How long did you do that job for?

A. About an hour and 20 minutes.

Q. And after an hour and 20 minutes, what did you do?

A. I went home. I got a hold of the, I got a hold of one of the girls that was down on the aisle and told them to go get John or Sandy. And John come and he walked me out of the store and to my pickup, and by that time I was throwing up.

Q. So you didn't, you acknowledge they offered you a job as a door greeter in August of 2007?

A. If I'm to believe it, yes, sir.

Q. Well, did he speak the words, you can be a door greeter?

A. Yes, sir.

Q. Okay. Did anyone else, after you were released by Dr. Blankenship, tell you you could be a door greeter other than Larry?

A. I think Yolanda said she was going to talk to Larry.

Q. But did anyone else offer you or have discussions with you about being a door greeter other than Larry and Yolanda?

A. No, sir, I don't think so.

There was also evidence presented that Yolanda Kimbrough, the Wal–Mart nurse supervisor noted that

> Dr. Blankenship released her back to work with restrictions of no lifting greater than 20#, no bending or stooping, no prolonged standing over 4 hours, no prolonged sitting over 2 hours. She returned to work on August 28, but decided after working one day that she could not continue to work for fear of falling and injuring herself. She turned in her resignation. Dr. Blankenship gave her permanent partial impairment rating of 11 % to the whole body.

The parties stipulated that Wal–Mart accepted and paid this eleven-percent permanent anatomical-impairment rating. The parties also stipulated that Keys "was granted a change of physician to Dr. Harold Chakales on July 21, 2009." Dr. Chakales examined Keys on August 5, 2009, and diagnosed: "1. Status post op lumbar laminectomy and fusion. 2. Chronic pain syndrome. DISCUSSION: I will see this lady in 3 weeks. I have given her Darvocet for pain." Wal–Mart paid for Keys's visit with Dr. Chakales on August 5, 2009, but controverted any additional treatment.

The record indicates that Keys treated with Dr. James Hawk on July 20, 2010, August 20, 2010, September 20, 2010, October 20, 2010, and January 3, 2011. Keys's attorney stated at the March 30, 2011 hearing that Keys had begun treating with Dr. Hawk, without a referral from Dr. Chakales, because Dr. Chakales's health was deteriorating. The Commission affirmed "the administrative law judge's findings that [Keys] did not prove she was permanently disabled." However, the Commission further found that Keys proved she sustained wage-loss disability in the amount of twenty-five percent, exceeding her eleven-percent anatomical impairment, and that "she was entitled to a change of physician to Dr. Hawk." It is from this decision of the Commission that Wal–Mart now appeals.

The primary question before the Commission was whether the Wal–Mart "greeter" job offered to Keys in September 2007 was a bona fide offer of employment that disqualified her from receiving wage-loss benefits. We review decisions of the Commission by considering whether there is substantial evidence to support its decision. *Wheeler Constr. Co. v. Armstrong,* 73 Ark.App. 146, 41 S.W.3d 822 (2001). Substantial evidence is that relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* at 146, 41 S.W.3d at 822. Questions concerning the credibility of witnesses and the weight to be give their testimony are within the exclusive province of the Commission. *Sivixay v. Danaher Tool Grp.,* 2009 Ark. App. 786, at 6, 359 S.W.3d 433, 436. Further, we review the evidence and all reasonable inferences in the light most favorable to the Commission's findings and affirm if its findings are supported by substantial evidence. *Id.*

The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Wal–Mart Stores, Inc. v. Connell,* 340 Ark. 475, 10 S.W.3d 882 (2000). When a claimant has an impairment rating to the body as a whole, the Commission has the authority to increase the disability rating based upon wage-loss factors. *Lee v. Alcoa Extrusion, Inc.,* 89 Ark.App. 228, 201 S.W.3d 449 (2005). The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other factors affecting wage loss, such as the claimant's age, education, and work experience. *Logan Cnty. v. McDonald,* 90 Ark.App. 409, 206 S.W.3d 258 (2005). Motivation, post-injury in-

come, credibility, demeanor, and a multitude of other factors are matters to be considered in claims for wage-loss-disability benefits in excess of permanent physical impairment. *Henson v. Gen. Elec.*, 99 Ark.App. 129, 257 S.W.3d 908 (2007).

An employee who is extended a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his average weekly wage at the time of the accident is not entitled to permanent-partial-disability benefits in excess of the percentage of permanent physical impairment. Ark.Code Ann. § 11–9–522(b)(2) (Repl.2012). The employer has the burden of proving a bona fide offer of employment. Ark.Code Ann. § 11–9–522(c)(1) (Repl.2012).

Here, the Commission considered many factors affecting Keys's earning capacity, such as motivation, post-injury income, demeanor, and credibility, and specifically found her to be credible and a hard worker. The Commission also found that when Keys attempted to return to work, she was assigned duties that exceeded her physical limitation and even if Wal–Mart "did eventually decide to offer [Keys] a job as a door greeter, the record does not demonstrate that such a position was intended to be permanent." In fact, the Commission noted that the record is replete with references to the fact that the offer was "for now." Keys claimed and the Commission agreed that Wal–Mart's "bait and switch" approach to post-injury employment is nothing more than an "insincere way to exclude deserving workers from benefits."

■ In response, Wal–Mart claims that the Commission improperly added a permanency component to the bona-fide-offer requirement. We agree with Wal–Mart that such a requirement is not contemplated by the statute and is at odds with our state's strong at-will-employment doctrine. However, we do not agree that

the Commission required such an additional burden ₈of Wal–Mart. Instead, the evidence shows that Keys did not receive a bona fide offer from her employer. Obviously, an employee must be capable of performing the required job activities in order for the proposed position to be considered a bona fide offer of employment. According to the description of the job and Keys's experience working in the precise position she was being offered, the job was beyond her physical limitations. Again, the employer has the burden of proving "a bona fide offer to be employed." Ark. Code Ann. § 11–9–522(c)(1). Wal–Mart simply failed to carry its burden of proof relating to the legitimacy and limitations of the alleged "greeter" position. We hold that the Commission's determination that the statute does not bar an award of wage-loss disability under the specific facts presented is supported by substantial evidence.

■ Wal–Mart alternatively contends that if the Commission's award of twenty-five percent wage-loss disability is not barred, there is no substantial evidence to support it. In making the award the Commission stated that it had considered Keys's age, education, work experience, attitude and motivation, permanent anatomical impairment, and permanent physical limitations, all of which are appropriate matters for the Commission to consider. Ark.Code Ann. § 11–9–522(b) (Repl.2012); *Weyerhaeuser Co. v. McGinnis*, 37 Ark. App. 91, 824 S.W.2d 406 (1992).

■ There is ample evidence in the record to support the Commission's conclusion relating to Keys's wage-loss disability. Specifically, the evidence showed that she has only an eighth-grade education, is sixty-one years old, and the vocational expert opined that Keys had no marketable skills. These facts coupled with the fact that she

continues to have pain, albeit managed, and lifting and standing restrictions, offer a substantial basis to support the Commission's conclusion that Keys was realistically precluded from most employment possibilities. When the issue is whether the Commission's decision is supported by substantial evidence, we reverse only if reasonable minds could not have reached the conclusion of the Commission. *Hope Brick Works v. Welch,* 33 Ark.App. 103, 802 S.W.2d 476 (1991). Here, the Commission's award of wage-loss disability is supported by substantial evidence, and we affirm.

Finally, Wal–Mart contends that the Commission's decision to allow Keys a change of physician to Dr. Hawk was not supported by substantial evidence. Keys's attorney stated at the March 30, 2011 hearing that Keys had begun treating with Dr. Hawk, without a referral from Dr. Chakales, because Dr. Chakales's health was deteriorating. Ark.Code Ann. § 11–9–514(b) (Repl.2012) provides: "Treatment or services furnished or prescribed by any physician other than the ones selected according to the foregoing, except emergency treatment, shall be at the claimant's expense." The Commission reasoned that because Dr. Hawk was not an authorized physician, his treatment to date would usually be at Keys's expense, but went on to note that Dr. Chakales died on December 13, 2011. The Commission also found that Dr. Chakales's passing occurred subsequent to the hearing in this matter and after the parties filed briefs on appeal. The Commission held "because the doctor to whom the claimant was granted a change of physician has died, the change of physician order has effectively been nullified. Accordingly, the Full Commission grants the claimant a change of physician to Dr. Hawk as if the claimant's first change of physician never occurred."

 We are satisfied that because of her physician's deterioration and ultimate death, Keys was not receiving the treatment that she is statutorily entitled to receive under Arkansas law. And, we agree with the Commission's conclusion that Keys was receiving treatment from Dr. Hawk only because Dr. Chakales was unable to perform the duties—due to his advanced age and declining health—at the time she attempted to treat with him. As such, there is substantial evidence to support the Commission's decision approving the change-of-physician, and we affirm on this point as well.

Affirmed.

GLOVER and MARTIN, JJ., agree.